John A. Vogt (State Bar No. 198677)
javogt@jonesday.com
JONES DAY
3161 Michelson Drive
Suite 800
Irvine, CA  92612.4408
Telephone: +1.949.851.3939
Facsimile:  +1.949.553.7539

Attorneys for Defendant
EXPERIAN INFORMATION
SOLUTIONS, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| HANNAH WEINSTEIN, an individual,<br><br>            Plaintiff,<br><br>       v.<br><br>EQUIFAX INFORMATION SERVICES LLC, et al.,<br><br>            Defendants. | Case No. 2:17-cv-08704 DSF (JEMx)<br><br>Assigned for all purposes to Hon. Dale S. Fischer<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Date:   July 1, 2019<br>Time:   1:30 p.m.<br>Place:  Courtroom 7D |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

LEGAL STANDARD ....................................................................................... 10

LEGAL ARGUMENT....................................................................................... 10

    I.      PRINCIPLES GOVERNING ARTICLE III STANDING................ 10

    II.     WEINSTEIN LACKS ARTICLE III STANDING ........................... 15

          A.     WEINSTEIN'S ALLEGED EMOTIONAL DISTRESS CANNOT CONFER STANDING ........................................... 15

          B.     WEINSTEIN'S OTHER CLAIMED INJURIES DO NOT CONFER ARTICLE III STANDING ...................................... 18

          C.     WEINSTEIN LACKS STANDING TO SEEK RELIEF UNDER SECTION 1681E(B)................................................. 20

CONCLUSION.................................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Bassett v. ABM Parking Servs., Inc.*,
    883 F.3d 776 (9th Cir. 2018) .......................................................................*passim*

*Cetacean Cmty. v. Bush*,
    386 F.3d 1169 (9th Cir. 2004) ............................................................................ 11

*Crump v. Carrington Mortgage Services*,
    2019 WL 118490 (N.D. Ill. Jan. 7, 2019) .................................................... 17, 18

*Del Llano v. Vivint Solar Inc.*,
    No. 17-CV-1429-AJB-MDD, 2018 WL 656094 (S.D. Cal.
    Feb. 1, 2018) ....................................................................................................... 19

*Dutta v. State Farm Mutual Automobile Insurance Company*,
    895 F.3d 1166 (9th Cir. 2018) ............................................................ 1, 12, 13, 14

*Harrington v. Choicepoint Inc.*,
    No. 05-cv-01294, 2006 WL 8198396 (C.D. Cal. Oct. 11, 2006) ....................... 20

*Henson v. CSC Credit Servs.*,
    29 F.3d 280 (7th Cir. 1994) ................................................................................ 16

*In re Apple iPhone Antitrust Litig.*,
    846 F.3d 313 (9th Cir. 2017) .............................................................................. 10

*Jaras v. Equifax, Inc.*,
    No. 17-15201, 2019 WL 1373198 (9th Cir. Mar. 25, 2019) .......................*passim*

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................11, 16, 19, 21

*Nayab v. Capital One Bank, N.A.*,
    No. 3:16-CV-3111-CAB-MDD, 2017 WL 2721982 (S.D. Cal.
    June 23, 2017)...................................................................................................... 19

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*,
    879 F.3d 339 (D.C. Cir. 2018)........................................................................*passim*

*Robins v. Spokeo, Inc.*,
    867 F.3d 1108 (9th Cir. 2017)........................................................................*passim*

*Sarver v. Experian Info. Sols.*,
    390 F.3d 969 (7th Cir. 2004)............................................................16, 17, 18, 19

*Shaw v. Experian Information Solutions, Inc.*,
    891 F.3d 749 (9th Cir. 2018)..........................................................................20

*Sommatino v. United States*,
    255 F.3d 704 (9th Cir. 2001)..........................................................................10

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................11

*Summers v. Earth Island Inst.*,
    555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ........................................12

*Thornhill Publishing Co. v. General Telephone & Electronics Corp.*,
    594 F.2d 730 (9th Cir. 1979).....................................................................10, 11

*Wright v. Experian Info. Sols., Inc.*,
    805 F.3d 1232 (10th Cir. 2015)..................................................................17, 18

# **INTRODUCTION**

In *Spokeo, Inc. v. Robins*, the Supreme Court held that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 136 S. Ct. 1540, 1549 (2016). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*.

After *Spokeo* was decided, the Ninth Circuit, on a number of occasions, has been called upon to address what constitutes concrete harm sufficient to confer Article III standing for claims brought under the Fair Credit Reporting Act. Most recently, in *Jaras v. Equifax, Inc.*, No. 17-15201, 2019 WL 1373198 (9th Cir. Mar. 25, 2019), the Ninth Circuit addressed standing to pursue claims under Section 1681i of the FCRA—the *same* statute at issue here. The Ninth Circuit held that when a consumer reporting agency has not furnished a consumer report to a third party containing an inaccurate trade line, a plaintiff has not suffered an injury-in-fact to support Article III standing. *Id.* at *2. *Jaras* is in accord with other recent Ninth Circuit cases addressing Article III standing to bring claims under the FCRA. *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 782 (9th Cir. 2018) ("Without [the] disclosure of [her] private information to a third party," a plaintiff lacks Article III standing to pursue claims under the FCRA); *Dutta v. State Farm Mutual Automobile Insurance Company*, 895 F.3d 1166 (9th Cir. 2018) (although Plaintiff could establish that there were inaccuracies in his file in violation of the FCRA, he could not establish that those inaccuracies caused him any concrete harm so as to confer him Article III standing).

Controlling Ninth Circuit precedent compels dismissal of Hannah Weinstein's lawsuit under Rule 12(b)(1). The trade line at issue in this case—an account held by defendant Fidelity—was first reported to Experian by Fidelity on May 17, 2017. Fidelity instructed Experian to delete—and Experian did delete—that trade line on November 10, 2017. Weinstein filed suit after the trade line had been deleted.

During the six-month window that the Fidelity account appeared in Weinstein's file, she did not "engage in any transactions for which the alleged misstatements in [her] credit reports made or would make any material difference." *Jaras*, 2019 WL 1373198 at *2. In fact, *besides Weinstein herself*, no third party was even aware of the existence of the Fidelity trade line prior to its deletion.

As a consequence, Weinstein—at *most*—can establish the "mere existence" of the Fidelity Account on her file. *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 345 (D.C. Cir. 2018). She cannot establish, for purposes of Article III standing, "the *dissemination* of inaccurate information," *id.*, or, in the words of the Ninth Circuit, "[the] disclosure of [her] private information to a third party." *Bassett*, 883 F.3d at 782. Accordingly, Weinstein lacks Article III standing, and her case against Experian must be dismissed under Rule 12(b)(1).

## STATEMENT OF FACTS

On May 19, 2017, Fidelity Creditor Service, Inc. first reported to Experian a collection account for Weinstein with an original amount of $9,170.00. (Declaration of Kimberly Cave ("Cave Decl."), ¶ 3.) On June 29, 2017, Weinstein contacted Experian via the internet to obtain a consumer disclosure, which Experian provided to her. (*Id.*, ¶ 4 and Ex. 1.) A "consumer report," or what is more commonly known as a "credit report," is a report of credit information prepared and furnished by a consumer reporting agency to a credit grantor, insurer, or employer for the purpose of evaluating a consumer's eligibility for credit to be used primarily for personal, family or household purposes, or for employment purposes pursuant to 15 U.S.C. § 1681b. (*Id.*) On the other hand, when a consumer, like Weinstein, seeks access to her *own* credit information directly from a consumer reporting agency, like Experian, the resulting document is called a "consumer file disclosure" or "consumer disclosure," which is made under 15 U.S.C. § 1681g. (*Id.*)

On July 5, 2017, Experian received mail correspondence from Weinstein disputing the Fidelity Account. (*Id.*, ¶ 5 and Ex. 2.) Seven days later, Experian sent

Fidelity a copy of Weinstein's entire dispute correspondence with an Automated Consumer Dispute Verification (ACDV) form, asking Fidelity to review and investigate the disputed information. (*Id*.) On July 27, 2017, Fidelity responded by: (1) verifying that it had reviewed Weinstein's dispute correspondence, (2) verifying that the disputed information was accurate, and (3) updating the balance from $9760 to $9802. (*Id*., ¶ 6 and Ex. 3.)

On July 27, 2017, Experian mailed Weinstein the results of the reinvestigation of her dispute of the Fidelity Account. (*Id*., ¶ 7 and Ex. 4.) On November 10, 2017, at Fidelity's request, Experian deleted the Fidelity Account from Weinstein's file at Experian. (*Id*., ¶ 8.) Experian received no further communication about the Fidelity Account from Weinstein, or anyone on Weinstein's behalf, before she filed this lawsuit on December 1, 2017. (*Id*., ¶ 7.) About four weeks later, Experian generated post-litigation file disclosure, which reflected the deletion of the Fidelity Account. (*Id*., ¶ 9 and Ex. 5.)

During the time period within which the Fidelity Account appeared in Weinstein's file at Experian—May 19, 2017 to November 10, 2017—there were no "hard" inquiries on Weinstein's file. (*Id*., ¶ 10 and Exs. 1 & 5.) A "hard" inquiry is when Experian prepares a "consumer report" based upon an action that a consumer took, such as applying for credit or financing. (*Id*., ¶ 10.) A "consumer report" prepared in response to a "hard" inquiry would contain the trade lines currently reporting on a consumer's file. (*Id*.) Thus, with regard to Weinstein, had there been a "hard" inquiry during the time period within which the Fidelity Account was included in her file, a "consumer report" that Experian prepared would have included that account information. (*Id*.) But because there were no "hard" inquiries during the time period within which the Fidelity Account was included in Weinstein's file, Experian did not prepare a "consumer report" containing the Fidelity Account. (*Id*.)

During the time period within which the Fidelity Account appeared in Weinstein's file at Experian, there were several "soft" inquiries on Weinstein's file.

(*Id.*, ¶ 11 and Exs. 1 & 5.) Unlike a "hard" inquiry, a "soft" inquiry does not involve the furnishing of raw credit data. (*Id.*, ¶ 11.) The "soft" inquiries appearing on Weinstein's file during the relevant time period are as follows:

a. Experian: Inquiry—June 29, 2017

b. Bank of America: Account review—June 1, 2017.

c. American Express: Prescreened Offer of Credit—June 15, 2017

d. American Express: Prescreened Offer of Credit—July 17, 2017

e. SOFI Lending: Prescreened Offer of Credit—July 17, 2017

f. Capital One: Prescreened Offer of Credit—July 18, 2017

(*Id.*, ¶ 11 and Exs. 1 & 5.) Each of the "soft" inquiries is summarized in turn below.

### Experian Inquires

When Experian accesses a consumer's file, it is typically for purposes of file maintenance or in response to a consumer's request for information or disputes related to their file. (*Id.*, ¶12.) It does not involve the furnishing of credit information to any third party. (*Id.*) The Experian inquiries dated June 29, 2017 were for the purpose of responding to Weinstein's June 29, 2017 request to obtain a consumer disclosure which, as noted, Experian provided to her. (*Id.*)

### Bank of America Account Review

The Bank of America account review was related to its own account with Weinstein. (*Id.*, ¶ 13.) In connection with that account review, Experian did not deliver any raw credit data to Bank of America regarding Weinstein's other accounts. (*Id.*) That means that Experian did not furnish to Bank of America any information related to the Fidelity Account. (*Id.*) Thus, the only way that Bank of America would know about the existence of the Fidelity Account would have been if it made a "hard" inquiry, and obtained a copy of Weinstein's credit report. (*Id.*) That did not happen for Bank of America—or any other third party—during the time period within which the Fidelity Account appeared in Weinstein's file at Experian. (*Id.*)

### Prescreened Offers of Credit

During the time period within which the Fidelity Account appeared on Weinstein's file, there were four prescreened offers of credit. (*Id.*, ¶ 14.) Because these prescreened offers are posted on Weinstein's file, that means that potential creditors *extended* unsolicited offers of credit to Weinstein without her actually applying for credit. (*Id.*) These are typically credit offers that you get in the mail. (*Id.*) In connection with prescreened offers of credit, Experian does not provide specific information about individual accounts. (*Id.*) Instead, Experian provides a list of names of individuals that would qualify for the terms of the prescreened offer, as those terms are dictated and defined by the requesting creditor. (*Id.*) Thus, none of the creditors that made a prescreened offer of credit to Weinstein would have been aware of the Fidelity Account. (*Id.*) Experian is not aware of any prescreened offer that Weinstein did not qualify for during the time period within which the Fidelity Account appeared on Weinstein's file. (*Id.*)

Even though no third party was even aware of the Fidelity Account, *id.*, ¶ 17, Weinstein claims to have suffered the following damages arising out of the Fidelity Account vis-à-vis Experian: (1) emotional distress damages in the amount of $225,000; (2) damage to her credit reputation in the amount of $250,000; and (3) "credit turn-downs and quelling of Plaintiff's use of credit" damages in the amount of $25,000. (*See* Declaration of John A. Vogt ("Vogt Decl."), ¶¶ 2 & 3 and Ex. 1 [Interrogatory Nos. 18 and 19] and Ex. 2 [Response to Interrogatory Nos. 18 and 19].) She was asked to, but did not, identify any credit applications between May 2017 and November 2017. (*Id.* Ex. 2 [Response to Interrogatory No. 4].) Each item of her claimed damages is summarized below.

### Emotional Distress

*Before* she filed a dispute with Experian, Weinstein claims that her Bank of America credit card—an existing credit account—was declined twice. The first time her credit card was declined was on June 24, 2017, at Verdugo Bar, on the day before

her wedding.  (Vogt Decl., Ex. 3 [Weinstein Dep.] at 125:17–127:24.)  The next day, her credit card was declined a second time—when she tried to make a purchase at Eagle Rock Brewery.  (*Id*.)  Rather than continuing to "party elsewhere" with her friends that night, Weinstein went home, and called Bank of America. (*Id*.)

Weinstein believed that her credit card was declined because Bank of America "had seen some kind of negative reporting on my credit reports or that I had a derogatory account." (*Id*.)  Yet, in her credit file, there were no "hard" inquiries from Bank of America—or, for that matter, any "hard" inquiries from any other actual or potential creditor—that would have revealed the Fidelity trade line.  (Cave Decl., ¶ 10 and Exs. 1 and 5.)  On June 1, 2017, Bank of America conducted an "account review" of Weinstein's Bank of America account.  (*Id*., ¶¶ 11 & 13 and Exs. 1 and 5.) In connection with that account review, Experian did not deliver any raw credit data to Bank of America regarding Weinstein's other accounts.  (*Id*., ¶ 13.)  That means that Experian did not furnish to Bank of America any information related to the Fidelity Account.  (*Id*.)  Thus, Bank of America would not have even known of the Fidelity Account's existence.  (*Id*.)

On June 24, 2017, Bank of America sent Weinstein an e-mail alerting her that there was potential fraudulent activity on her credit card account.  (Vogt Decl., Ex. 4; *see also id*., Ex. 3 at 125:17–127:24.)  That e-mail was entitled: "Security Alert: Unusual credit card activity detected." (*Id*., Ex. 4.)  In the body of the e-mail, Bank of America advised Weinstein as follows:

> We're letting you know that we've detected some ***unusual activity*** on your Bank of America credit card on 06/24/2017.  For your security, please ***verify*** the following transaction(s) so that you can continue to use your card.

(*Id*. (emphasis added).)  The purpose of the alert was related to Weinstein's two attempted transactions discussed above.  (*Id*., Ex. 3 at 125:17–127:24.) Weinstein acknowledges that the alert that she received from Bank of America does not say that

her attempted charges were declined due to negative credit information on her file. (*Id*.)  Again, Bank of America would have had no visibility into, or knowledge of, the Fidelity Account on her file absent a "hard" inquiry, which Bank of America did not make.  (Cave Decl., ¶¶ 10 & 13.)

As requested, Weinstein called Bank of America to discuss the "unusual activity" on her credit card.  (Vogt Decl., Ex. 3 at 125:17–127:24.)  During that call, Weinstein confirmed to the Bank of America representative that the charges were accurate.  (*Id*.)  She testified that she has no recollection as to the explanation by Bank of America as to why her credit card was temporarily frozen.  (*Id*. ("Q.  Do you remember the content of the conversation as to was there an explanation given to you why the credit card was declined?  A.  No.").)  Nonetheless, after this phone call, Bank of America lifted the hold on her account, and the charges were processed on her credit card.  (*Id*.)

In discovery, Weinstein produced a copy of her Bank of America credit card bill for the period June 21, 2017 to July 20, 2017.  (Vogt Decl., Ex. 6 and Ex. 3 at 125:17–127:24.)  Her "previous balance" for the entire prior 30-day period was $1,172.78.  (*Id*.)  The Eagle Rock Brewery charge—$4,076.06—was *400% more* than her entire previous 30-day balance.  (*Id*.)  Weinstein conceded that the Eagle Rock transaction "is certainly not a common transaction[.]" (*Id*.)  Nonetheless, once Weinstein confirmed to Bank of America that she had made the purchases, the fraud hold promptly was lifted from the account.

There is no evidence that the Fidelity trade line had anything to do with the flagging of the transactions on her Bank of America credit card as potentially fraudulent.  (Cave Decl., ¶ 13.)  Indeed, again, if Bank of America had pulled her credit to make such a review and determination, it would have been reflected as a "hard" inquiry on Weinstein's credit file.  (*Id*., ¶ 10.)  There were no "hard" inquiries from Bank of America—or any other creditor—during the 6-month time period that the Fidelity Account appeared on her Experian file.  (*Id*.)  Thus, the "$225,000" in

1  "emotional distress" damages that Weinstein claims to have suffered could not have

2  been caused by the Fidelity trade line appearing in her file.  At deposition, Weinstein

3  testified that her attorney came up with that number:  "Q.  Now, do you see where it

4  states emotional distress damages of $225,000?  A.  Yes.  Q.  How did you come up

5  with that number?  A.  It's something that I really left to the advice of my attorney,

6  through conversations with my attorney."  (Vogt Decl., Ex. 3 at 137:22–138:25.)

7  ### Damage to Credit Reputation

8  Weinstein also claims that she suffered $250,000 in damages to her "credit

9  reputation" as a result of the Fidelity Account appearing in her Experian file.  (*Id.*,

10  Ex. 2 [Response to Interrogatory No. 18].)   Weinstein, however, admits that this

11  damages figure also came from her attorney:  "Q.  With respect to the item "Damage

12  to Plaintiff's Credit Reputation," it says $250,000.  Same question.  How did you

13  come to that number?  A.  Again, that was on advice from and in consultation with

14  my attorney."  (*Id.*, Ex. 3 at 137:22–138:25.)  Moreover, while Weinstein says that

15  she noticed a drop in her "FICO score" immediately before she incurred the charges

16  that Bank of America flagged as potentially fraudulent, *see id.*, Ex. 2 [Response to

17  Interrogatory No. 18], she acknowledges that Transunion—not Experian—was the

18  source of that score.  (*Id.*, Ex. 3 at 101:21–102:14.)  Regardless, the absence of a

19  "hard" inquiry on Weinstein's file during the time period within which the Fidelity

20  Account appeared means that Experian did not furnish to any third party any credit

21  score (or FICO score) regarding Weinstein in connection with an application for

22  credit. (Cave Decl., ¶ 17.)

23  Weinstein testified that the only documents supporting her claimed damages

24  in this case are:  (1) the e-mail she received from Bank of America about unusual

25  credit card activity; (2) the receipt she requested after she had withdrawn cash to pay

26  for the Verdugo Bar bill; and (3) her Bank of America credit card bill for the period

27  June 21, 2017 through July 20, 2017.  (Vogt Decl., Ex. 3 at 136:25–137:6.)  None of

28  these documents show "damage to credit reputation" as a result of the Fidelity

1  Account being included in Weinstein's file.

2  ### *Credit Turn-Downs and Quelling Use of Credit*

3  Finally, Weinstein claims to have suffered $25,000.00 in damages due to

4  "credit turn-downs and quelling of Plaintiff's use of credit." (*Id.*, Ex. 2 [Response to

5  Interrogatory No. 18].) At deposition, Weinstein was asked about this element of

6  damages. Here too, Weinstein testified that this damages number came from

7  her lawyer:

8  Q. And the final item which is "credit turn-

9  downs and quelling of Plaintiff's use of credit," it

10  says $25,000. How did you come up with that number?

11  A. Again, it was on the advice and in

12  consultation with my attorney.

13  Q. And any independent computation that you

14  performed to arrive at that number?

15  A. No.

16  (Vogt Decl., Ex. 3 at 137:22–138:25.) Furthermore, the only "credit turn-down" that

17  Weinstein has identified were the two charges on her existing Bank of America credit

18  card that were flagged as potentially fraudulent, and were processed as soon as

19  Weinstein verified the charges were valid. Weinstein did not apply for any new credit

20  during the period May 17, 2017 and November 10, 2017, *see* Cave Decl., ¶ 10 and

21  Exs. 1 and 5, and thus, could not have incurred any other "credit turn downs."

22  With regard to "quelling use of credit," if that means something different than

23  the two Bank of America credit card declines, Weinstein, in discovery, did

24  not identify any credit opportunity she considered pursuing, but chose not to

25  pursue—and, from an injury perspective, would have been successful in obtaining

26  had she so pursued it—because of the inclusion of the Fidelity Account on her

27  Experian file. (Vogt Decl., ¶¶ 2 & 3 and Ex. 2 [Response to Interrogatory No. 18].)

28

## LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal is appropriate when a court lacks subject matter jurisdiction over a claim. Fed. R. Civ. 12(b)(1). "A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, including for failure to allege injury sufficient for Article III standing, may be made at any time." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017).

"A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may ... attack the existence of subject matter jurisdiction as a matter of fact." *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Where, as here, the motion is a factual attack on subject matter jurisdiction, "no presumption of truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims." *Id.* at 733. "In reviewing a motion to dismiss based on lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the court may consider affidavits or any other evidence properly before the Court." *Sommatino v. United States*, 255 F.3d 704, 710 n. 3 (9th Cir. 2001). Moreover, "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Thornhill Publishing*, 594 F.2d at 733.

## LEGAL ARGUMENT

Weinstein cannot show that Experian disseminated any negative credit information about her. Instead, Weinstein—at *most*—can show that, for a six-month period of time, there was an allegedly inaccurate account appearing in her file at Experian that no one besides Weinstein herself even knew existed. As a matter of law, Weinstein lacks Article III standing, and the case must be dismissed. *Bassett*, 883 F.3d at 782; *Jaras*, 2019 WL 1373198, at *2.

## I.    PRINCIPLES GOVERNING ARTICLE III STANDING

Article III of the United States Constitution limits the "judicial Power" of the federal courts to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2.

As the Ninth Circuit repeatedly has emphasized, "a suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

To establish standing, Weinstein had to show:  (1) that she suffered an injury in fact, (2) caused by Experian, (3) that a judicial decision could redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The presence of an injury in fact is the "[f]irst and foremost" element a plaintiff must show to satisfy standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  The injury must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (citations and quotations omitted).  To be "particularized," "the injury must affect the plaintiff in a personal and individual way." *Id*. at 560 n.1.  To be "concrete" the injury "must actually exist"—that is, it must be "real" and "not abstract" or purely "procedural." *Spokeo*, 136 S.Ct. at 1548–49 (quotations and citations omitted).  The burden of establishing standing rests with Weinstein. *Id*. at 561; *Thornhill Publishing*, 594 F.2d at 733.  At this stage of the litigation, Weinstein cannot rely on allegations alone, but must set forth evidence demonstrating her standing. *Id*.  Moreover, after *Spokeo*, Weinstein cannot rely upon a bare procedural violation of the FCRA to establish her standing. *Spokeo*, 136 S. Ct. at 1549.

In *Spokeo*, the Supreme Court had occasion to clarify the nature of an injury that will satisfy standing's "concrete" injury requirement in the context of an action brought under the FCRA.  The Court explained that, although Congress may "'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law,'" Congress's identification of such harms "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504

U.S. at 578); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017) ("*Spokeo II*") ("[T]he mere fact that Congress said a consumer ... may bring such a suit does not mean that a federal court necessarily has the power to hear it."). Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S.Ct. at 1549.

The matter at hand involves alleged violations of two provisions of the FCRA: (1) Section 1681e(b) (the failure to have reasonable procedures to ensure the maximum possible accuracy of information contained in a consumer report), and (2) Section 1681i (the failure to conduct a reasonable reinvestigation of a consumer's dispute). Both statutory provisions set forth *procedures* that a consumer reporting agency must follow. Section 1681e(b) requires a consumer reporting agency to have "reasonable procedures" to "ensure the maximum possible accuracy" of information contained in a "consumer report." 15 U.S.C. § 1681e(b). Section 1681i requires a consumer reporting agency to conduct reasonable reinvestigations of consumer disputes over credit information. 15 U.S.C. § 1681i. But as the Ninth Circuit repeatedly has explained, "the plausible pleading of a flat out violation of a statutory provision will not necessarily support a civil law suit in federal court since 'a bare procedural violation [of a law creating that right], divorced from any concrete harm' will not constitute an injury-in-fact as demanded by Article III." *Dutta*, 895 F.3d at 1173 (quoting *Spokeo*, 136 S.Ct. at 1549); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). In order to have standing under Article III for a procedural violation of the FCRA, a court "must consider whether, in the case before us, the procedural violation caused a real harm or a material risk of harm." *Dutta*, 895 F.3d at 1174.[1]

---

[1] Congress did not transform the FCRA's procedural requirements under Section 1681i and 1681e(b) into substantive rights, the deprivation of which automatically confers standing. As the Ninth Circuit emphasized in *Bassett*, there is

The Ninth Circuit has emphasized that the "'FCRA "was crafted to protect consumers from the ***transmission of inaccurate information*** about them" ***in consumer reports***.'" *Dutta*, 895 F.3d at 1174 (emphasis added) (quoting *Spokeo II*, 867 F.3d at 1113 (citations omitted)).  Thus, the mere existence of a violation of a procedural obligation under the FCRA does not automatically translate into concrete harm to confer Article III standing.  That was the holding in *Bassett*.  There, the Ninth Circuit held that the issuance of an unredacted receipt (a procedural violation of the FCRA) did not create a material risk of harm in the form of identity theft or the invasion of privacy sufficient to confer standing ***where the consumer retained possession of the receipt and no one else had viewed it***.  *Bassett*, 883 F.3d at 782–83.

Building upon this logic, the Ninth Circuit in *Jaras* recently explained that, in the context of a violation of Section 1681i—one of the <u>*same*</u> statutes that is at issue in this case—a plaintiff must do more than simply show that a consumer reporting agency failed its statutory procedural duty to conduct a reasonable reinvestigation.  *Jaras*, 2019 WL 1373198, at *2.  Instead, a plaintiff must establish that the violation of Section 1681i caused concrete harm.  *Id*.  Specifically, in order for a plaintiff to establish concrete harm flowing from a violation of Section 1681i, there must exist a "credit report harming Plaintiffs' ability to enter a transaction with a third party in the past or imminent future[.]"  *Id*.  Absent that, "Plaintiffs have failed to allege a concrete injury for standing."  *Id*.; *see also Owner-Operator*, 879 F.3d at 345 (Article III standing requires "the *dissemination* of inaccurate information, not its mere existence").  Thus, "[w]ithout [the] disclosure of private information to a third

a "distinction between a 'substantive' statutory violation that alone creates standing, and a 'procedural' statutory violation that may cause harm or a material risk of harm sufficient for standing."  *Bassett*, 883 F.3d at 782.  In the context of the FCRA, *Bassett* explains that, "[t]o the extent the FCRA arguably creates a 'substantive right,' it rests on nondisclosure of a consumer's private financial information to identity thieves."  *Id*. at 782-83.  Here, because [Weinstein's] private information was not disclosed to anyone but h[er]self, [] no such substantive right was invaded."  *Id*.

- 13 -

party," a plaintiff lacks Article III standing to pursue claims under the FCRA. *Bassett*, 883 F.3d at 782. Again, this makes perfect sense: The "'FCRA "was crafted to protect consumers from the ***transmission of inaccurate information*** about them" ***in consumer reports***.'" *Dutta*, 895 F.3d at 1174 (emphasis added) (citations omitted).

On remand from the Supreme Court, the Ninth Circuit in *Spokeo II* reached the same conclusion under Section 1681e(b)—the statutory basis of Weinstein's other FCRA claim. There, the Ninth Circuit "considered whether the alleged FCRA violations—Spokeo's publication on the internet of a credit report that falsely stated the plaintiff's age, marital status, wealth, education level, and profession, in violation of 15 U.S.C. § 1681e(b)—were more material than a zip code error and thus amounted to a sufficiently concrete injury to support Article III standing." *Jaras*, 2019 WL 1373198, at *2 (citing *Spokeo II*, 867 F.3d at 1111). The plaintiff alleged that the inaccuracies harmed his chances of making a favorable impression on prospective employers and that he was actively looking for a job. *Id.* (citing *Spokeo II*, 867 F.3d at 1117) In holding that the plaintiff did have standing, "we emphasized that the ***inaccuracies in the credit report*** at issue ***had already been requested and obtained by at least one third party***, and that they were of a type likely enough to cause harm to his employment prospects at a time when he was unemployed and actively looking for work." (*Id.*, citing *Spokeo II*, 867 F.3d at 1116-17.)

Thus, as the Ninth Circuit has held, the touchstone for Article III under either Section 1681i or Section 1681e(b) are inaccuracies in a "credit report" that have been "obtained by at least one third party." *Spokeo II*, 867 F.3d at 1116-17; *Jaras*, 2019 WL 1373198, at *2 (same; holding that to have standing under Section 1681i, there must exist a "credit report harming Plaintiffs' ability to enter a transaction with a third party in the past or imminent future[.]").

## II.   <u>WEINSTEIN LACKS ARTICLE III STANDING</u>

Under controlling Ninth Circuit precedent, Weinstein's case must be dismissed for lack of Article III standing. Even assuming, *arguendo*, that the Fidelity Account

is inaccurate, the "mere existence" of inaccurate information in one's file at a consumer reporting agency does not confer Article III standing. *Jaras*, 2019 WL 1373198, at *2. Instead, to establish standing, there must have been "dissemination of [the] inaccurate information." *Owner-Operator*, 879 F.3d at 345; *Bassett*, 883 F.3d at 782 (same). Here, the evidence establishes that Experian reported the Fidelity Account for about six months, a period during which Weinstein's credit information was never disseminated to a third party. She thus lacks Article III standing.

### A. WEINSTEIN'S ALLEGED EMOTIONAL DISTRESS CANNOT CONFER STANDING

Weinstein claims to have suffered $250,000 in emotional distress damages. None of those claimed damages can confer Article III standing for two independently sufficient reasons.

First, as just explained, the evidence establishes that the "emotional distress" that Weinstein claims to have suffered has nothing whatsoever to do with the existence of the Fidelity Account appearing on her file. Weinstein speculates that, in flagging two "not common" transactions as potentially fraudulent—transactions that Bank of America immediately processed after Weinstein, as Bank of America directed, called to confirm that the transactions were indeed legitimate—Bank of America was influenced by the Fidelity Account. The evidence shows that Bank of America was influenced by the uncommon nature of the transactions, which is why Bank of America sent Weinstein an e-mail that same day stating precisely that. It is also why Bank of America processed both charges after they were verified—which obviously would not have occurred if Bank of America's decision was influenced in any way by the existence of the Fidelity Account.

Indeed, for Bank of America to even have visibility into the Fidelity Account, it would have been required to pull Weinstein's credit report from Experian. (Cave Decl., ¶ 13.) During the six month period that the Fidelity Account appeared in Weinstein's file, there was not a single credit report that was issued to Bank of

America—or, for that matter, anyone else—regarding Weinstein. (*Id.*)  Accordingly, the "emotional distress" the Weinstein claims to have suffered is not an injury-in-fact to confer Article III standing because it is not "fairly traceable" to Experian's conduct. *Lujan*, 504 U.S. at 560–61.

Second, Weinstein cannot even claim emotional distress damages because they were purportedly incurred *before* Weinstein ever disputed her account with Experian. The Fidelity Account was first reported to Experian on May 17, 2017.  Weinstein disputed the accuracy of this account on June 29, 2017.  After the account was reported—but *before* Weinstein filed her dispute—she claims that her Bank of America credit card was declined.  Even though there is no evidence that the card was declined due to the existence of the Fidelity Account, Experian, as a matter of law, is not responsible for harm that Weinstein claims to have suffered *before* she lodged her dispute.

In *Henson*, the Seventh Circuit held that "a consumer reporting agency was not liable, as a matter of law, for reporting information from a judgment docket unless there was prior notice from the consumer that the information might be inaccurate." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 973 (7th Cir. 2004) (citing *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994)).  In *Sarver*, the Seventh Circuit expanded upon its decision in *Henson*, applying it to information that a consumer reporting agency receives from a financial institution, like Fidelity:

> In the absence of notice of prevalent unreliable information from a reporting lender, which would put Experian on notice that problems exist, we cannot find that such a requirement to investigate [prior to receiving a consumer dispute] would be reasonable given the enormous volume of information Experian processes daily.

*Sarver*, 390 F.3d at 972-73.  *Sarver* thus holds that, as a matter of law, "[i]n the

absence of notice of prevalent unreliable information from a reporting lender," Section 1681e(b) did not prohibit the consumer reporting agency from reporting a debt based solely upon information obtained from the creditor before receiving notice that the plaintiff disputed the debt. *Crump v. Carrington Mortgage Services*, 2019 WL 118490, at *6 (N.D. Ill. Jan. 7, 2019) (following *Sarver*, and holding that "prior to receiving [plaintiff's] dispute letter, Experian did not violate § 1681e(b) by relying on the information that [the furnisher] reported[.]"); *see also Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1241 (10th Cir. 2015) (same).

Here, there is no claim in this case that Experian violated the FCRA by including the Fidelity Account in Weinstein's file as reported by Fidelity on May 17, 2017. Nor, could there be: The evidence establishes that Experian did not have any "notice of prevalent unreliable information from [Fidelity]." (*See* Cave Decl., ¶ 3.) Instead, the focus of Weinstein's claims—both under Section 1681e(b) and Section 1681i—are on Experian's procedures in reinvestigating her dispute, specifically, on whether Experian should have deleted the Fidelity Account based upon Weinstein's inclusion of the consolidation order in her dispute letter. Indeed, that is the triable issue of material fact that this Court found to exist regarding Weinstein's claims against Experian: "A jury may yet find that Experian acted reasonably in its reinvestigation given the arguably ambiguous nature of the unlawful detainer court's order, but that is not an issue this Court can decide as a matter of law." (Dkt No. 77 at 4.)

Thus, Experian is not liable to Weinstein for any alleged injuries *before* she filed her dispute. *Sarver*, 390 F.3d at 972-73; *Wright*, 805 F.3d at 1241; *Crump*, 2019 WL 118490, at *6. As she testified at deposition, all of her $250,000.00 in claimed "emotional distress" injuries relate to her Bank of America credit card declines, which occurred *before* she filed her dispute with Experian regarding the Fidelity account. As a matter of law, Weinstein is foreclosed from recovering for her claimed "emotional distress" injuries. *Sarver*, 390 F.3d at 972-73. Or more to the point,

because Weinstein has no claim under the FCRA for Experian's inclusion of the Fidelity Account in her file for the time period *before* Weinstein filed her dispute, any "emotional distress" she claims to have suffered pre-dispute is not an injury-in-fact to confer Article III standing.[2]

## B.   WEINSTEIN'S OTHER CLAIMED INJURIES DO NOT CONFER ARTICLE III STANDING

In response to Experian's written discovery, Weinstein identified two additional elements of damages—(1) damage to credit reputation, and (2) credit turn-downs / quelling use of credit.  Neither of these claimed damages gives rise to Article III standing.

First, the $250,000 in damages that Weinstein claims to have suffered due to harm to "credit reputation" was provided by her lawyer.  That is, that calculation has no evidentiary basis.  Moreover, because Weinstein did not apply for credit during the time period within which the Fidelity account appeared in her Experian file, no potential creditor even saw, or was aware of, the Fidelity Account.  (Cave Decl., ¶ 18.)  In the absence of a third party knowing the existence of the Fidelity Account, Weinstein's "credit reputation" could not have been harmed.  That is why the Ninth Circuit, and courts across the United States, have held that Article III standing requires "the *dissemination* of inaccurate information, not its mere existence." *Owner-Operator*, 879 F.3d at 345; *Bassett*, 883 F.3d at 782 ("Without disclosure of [] private information to a third party," a plaintiff lacks standing to pursue claims under the FCRA.); *Jaras*, 2019 WL 1373198, at *2 (same);  *Spokeo II*, 867 F.3d at 1116-17 (inaccurate credit report obtained by at least one third party).[3]

---

[2] Weinstein claims that she was distressed when she noticed a drop in her credit score, which was provided by Transunion (not Experian) (*See* Vogt Decl., Ex. 2 [Response to Interrogatory No. 18].)  But because that claimed distress occurred *before* she filed her dispute with Experian, *see id.*, it is not actionable under the FCRA.  *Sarver*, 390 F.3d at 972-73.

[3] While Weinstein claims that she noticed a drop in her FICO score when reviewing her Bank of America account online, she acknowledges that Transunion,

<u>Second</u>, Weinstein's claimed harm arising out of "credit turn downs" either is legally irrelevant or without factual support.  The only "credit turn downs" that Weinstein identified in discovery are the two credit card transactions that Bank of America flagged as potentially fraudulent, but ultimately processed once Weinstein confirmed that the transactions were legitimate.  As demonstrated above, not only do these "credit turn downs" have nothing to do with the Fidelity Account in particular, or Experian in general, but they occurred <u>*before*</u> Weinstein filed a dispute with Experian, rendering them legally irrelevant. *Sarver*, 390 F.3d at 972-73.

Besides the two credit card transactions related to her Bank of America account, Weinstein did not sustain any other "credit turn downs" during the period of time that the Fidelity Account appeared in her file.  The reason this is so is because Weinstein did not apply for any credit during that time period.  Thus, at most, all that Weinstein can establish is the "mere existence" of the Fidelity Account on her file.  She cannot establish "the *dissemination* of inaccurate information," *Owner-Operator*, 879 F.3d at 345, which is required to establish Article III standing. *Bassett*, 883 F.3d at 782; *Jaras*, 2019 WL 1373198, at *2.[4]

---

not Experian, is the source of a FICO score.  (*Id.*, Ex. 3 at 101:21–102:14.)  Thus, a drop in a FICO score that Experian did not even report is not an action that is "fairly traceable" to Experian's conduct. *Lujan*, 504 U.S. at 560–61.  Moreover, a drop in credit score, standing alone, is insufficient to confer Article III standing. *Nayab v. Capital One Bank, N.A.*, No. 3:16-CV-3111-CAB-MDD, 2017 WL 2721982, at *2 (S.D. Cal. June 23, 2017); *Del Llano v. Vivint Solar Inc.*, No. 17-CV-1429-AJB-MDD, 2018 WL 656094, at *6-7 (S.D. Cal. Feb. 1, 2018), appeal dismissed, No. 18-55189, 2018 WL 2251782 (9th Cir. Apr. 9, 2018).

[4] Finally, if "quelling use of credit" means something different than the Bank of America credit card declines, Weinstein, in discovery, did not identify any credit opportunity she considered pursuing, but chose not to pursue—and would of obtained if she so pursued it—because of the inclusion of the Fidelity Account on her Experian file.  That is, in the words of *Jaras*, Weinstein did not identify any transaction that she tried to engage in, or was imminently planning to engage in, for which the allegedly inaccurate Fidelity account would have made any material difference. *Jaras*, 2019 WL 1373198, at *2.

### C.   <u>WEINSTEIN LACKS STANDING TO SEEK RELIEF UNDER SECTION 1681E(B)</u>

Independent of the foregoing, the Court should dismiss Weinstein's claim under Section 1681e(b) of the FCRA for lack of standing because Experian did not prepare a "consumer report" containing inaccurate credit information.

Under Section 1681e(b) of the FCRA, a consumer reporting agency must "follow reasonable procedures to assure maximum possible accuracy" in the preparation of "consumer reports." 15 U.S.C. § 1681e(b).  By definition, "consumer reports" are documents prepared for *third parties* for *eligibility determinations*. *See Shaw v. Experian Information Solutions, Inc.*, 891 F.3d 749, 755 n.3 (9th Cir. 2018) ("A consumer, or credit, report is a CRA-prepared report that a CRA issues to third parties for certain qualifying purposes.") (citing 15 U.S.C. § 1681a(d)(1); *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 908 (7th Cir. 2007)); *see also Harrington v. Choicepoint Inc.*, No. 05-cv-01294, 2006 WL 8198396, at *6 (C.D. Cal. Oct. 11, 2006).

Even if a jury were to find that the Fidelity trade line was inaccurate, Experian indisputably did not prepare a "consumer report" containing the Fidelity Account. (Cave Decl., ¶ 18 and Exs. 1 & 5.)  Indeed, there was not a single credit pull during the time period that Experian included the Fidelity account in Weinstein's file.  (*Id.*) Because Experian did not prepare a consumer report containing the Fidelity Account, Weinstein, as a matter of law, has no standing to challenge the reasonableness of Experian's procedures under Section 1681e(b). *Spokeo II*, 867 F.3d at 1116-17. For this independent reason, the Court should dismiss the Section 1681e(b) claim for lack of Article III standing.

### <u>CONCLUSION</u>

Under *Spokeo* and the recent decisions of the Ninth Circuit that have followed it, in order for a plaintiff to have Article III standing to pursue claims under the FCRA, a plaintiff must establish that a consumer reporting agency disseminated

inaccurate credit information.  This is true for a claim under Section 1681i.  *Jaras*, 2019 WL 1373198, at *2.  It is also true for a claim under Section 1681e(b).  *Spokeo II*, 867 F.3d at 1116-17.  Here, all that Weinstein can establish is the "mere existence" of the Fidelity Account on her file for a period of about six months.  She cannot establish "the dissemination of inaccurate information," *Owner-Operator*, 879 F.3d at 345, which is required for Article III standing.  *Bassett*, 883 F.3d at 782; *Jaras*, 2019 WL 1373198, at *2.  Because Article III standing must exist at all stages of the litigation, *Lujan*, 504 U.S. at 561, and the evidence establishes that Weinstein lacks standing under Article III to pursue her claims, Experian respectfully requests that the Court dismiss this action under Rule 12(b)(1).

Dated:  May 31, 2019                           JONES DAY


                                               By: */s/ John A. Vogt*
                                                   John A. Vogt

                                               Attorneys for Defendant
                                               EXPERIAN INFORMATION
                                               SOLUTIONS, INC.